Appeal of JAMES REES & SONS CO.*

JAMES REES & SONS CO. v. PITTSBURGH & CINCINNATI PACKET LINE.

(Circuit Court of Appeals, Third Circuit. December 8, 1916.)

No. 2161.

1. CORPORATIONS ⬤⇒568—DISTRIBUTION OF FUNDS—PRIORITIES.

Where the final report of a receiver for an insolvent corporation after a sale of its assets was approved absolutely, all exceptions thereto being withdrawn, and on the appointment of an auditor to make distribution of the fund all parties interested therein stipulated that a certain list prepared by the receiver of creditors who had proved their claims was

---

agreed upon as the proper creditors entitled to share in the fund, with no reference to actual or asserted priority on the part of any creditor, the auditor and the court properly distributed the fund in accordance with such list, without priorities.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2288, 2289; Dec. Dig. 568.]

2. CORPORATIONS 566(1)—DISTRIBUTION OF FUNDS—PRIORITIES.

Where, at suit of a creditor, a receiver was appointed for a ship-owning corporation, who took possession of and sold all of its property, the complainant and certain other creditors, by subsequently filing libels in admiralty claiming liens, but without seizure of the vessels, acquired thereby no right to preference over other lien claimants, who merely proved their claims in the receivership suit.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 2283; Dec. Dig. 566(1).]

Appeal from the District Court of the United States for the Western District of Pennsylvania; W. H. Seward Thomson, Judge.

Suit in equity by the James Rees & Sons Company against the Pittsburgh & Cincinnati Packet Line. From the order of distribution, complainant appeals. Affirmed.

See, also, 237 Fed. 563, —— C. C. A. ——.

The following is the opinion of Thomson, District Judge:

On August 6, 1908, at the suit of James Rees & Sons Company at the above number and term of this court, the Pittsburgh & Cincinnati Packet Line, a corporation of the state of West Virginia, was placed in the hands of James A. Henderson, receiver. The tangible property of the company consisted of three freight and passenger steamers, known as the Queen City, Virginia, and Keystone State, one wharfboat at Pittsburgh, and 50 shares, being one-half, of the capital stock of the Coney Island Wharfboat Company, which was the owner of a wharfboat at Cincinnati; a corporation known as the Coney Island Company being the owner of the other 50 shares. On November 10, 1909, the receiver filed his first and partial account which included the proceeds of the sale of the steamer Keystone State, showing a balance for distribution of $2,980.97. No exceptions were filed to this account and the same was confirmed absolutely. Alfred Kerr, Esq., was appointed an auditor to make distribution of this fund. To his report, as prepared, certain exceptions were filed, and before their determination Mr. Kerr died. On June 27, 1914, the receiver filed a second and final account, into which he carried the balance shown by his first account. To various items of this second account Lowrie C. Barton, Esq., representing certain creditors, filed exceptions, and on June 27, 1914, Albert York Smith, Esq., was appointed auditor to pass upon any exceptions that might be filed to the first account or to the second account of the receiver, to hear and pass upon all exceptions filed, and to report a schedule of distribution. No exceptions were filed to the first account, and before the auditor the exceptions to the final account were withdrawn, so that both accounts as filed were thus confirmed. It then became the duty of Mr. Smith to pass upon the exceptions which had been filed to Mr. Kerr's report, to pass upon any additional claims presented, and to make distribution of the balance shown by the second account. The auditor prepared his report and schedule of distribution, to which exceptions were filed by the commonwealth of Pennsylvania, G. W. C. Johnson, and James Rees & Sons Company. While proceedings were pending on said exceptions, and before their determination, Mr. Smith, the auditor, died whereupon by stipulation filed in court it was agreed that the report and schedule of distribution of said auditor, together with the exceptions filed thereto, be forthwith filed in court, to be heard by the court with the same effect as if said exceptions had been overruled by the auditor and renewed in court.

Proceeding now to the exceptions so filed: First, the exceptions of G. W. C. Johnson: This claimant was the purchaser, for the sum of $22,200, of the principal part of the property of the defendant company, including the one-half interest in the Cincinnati wharfboat, represented by 50 shares of the stock of the Coney Island Wharfboat Company. Claimant asserts that by reason of certain facts, it was the duty of the receiver to pay to him one-half of a certain promissory note of $3,000, made by the Coney Island Wharfboat Company, and indorsed by the Pittsburgh & Cincinnati Packet Line and the Coney Island Company. It is the position of the claimant that this note was given for the accommodation of the indorsers, each of which were indebted to the First National Bank of Cincinnati, which became the holder of the note, for one-half of the amount thereof; that the Coney Island Company has paid its half of said note, but that since the purchase of the property aforesaid the claimant has been compelled to pay one-half of the note, or $1,500, to the bank. The claimant alleges it was understood between the receiver and the various bidders at the sale of the property that the indebtedness ($1,500) aforesaid should not be paid by the purchaser of said property; that Mr. Brooks, the president of the Coney Island Company, was present and a bidder for one-half of the interest in the Cincinnati wharfboat, and that the property was offered for sale on two different occasions, and that he asked the attorney for the receiver if the stock of the Coney Island Wharfboat Company was to be sold clear of any incumbrance against the Wharf Company, and that the attorney and the receiver stated it was to be sold free of all incumbrances; and that upon receiving this information Brooks increased his bid for the one-half interest in the sum of $1,500, and that claimant based his bid upon the assumption that defendant would pay the $1,500 out of the proceeds of the sale of the one-half interest in the Cincinnati wharfboat, and that he had no understanding that he would be obliged to pay the further sum of $1,500 on account of the indebtedness evidenced by the said promissory note, and that it was his understanding that he would be compelled to pay nothing in addition to his bid. To the petition of the claimant, which was presented to court, an answer was filed denying the material averments, and the matter was submitted to Mr. Smith, the auditor, for determination. The auditor reviewed the testimony, and considered the claim carefully, and concluded that the claim should not be allowed. A careful examination has convinced me that the auditor was correct. I do not consider it necessary to go into details in the consideration of the claim. The evidence shows the wharfboat in question was originally bought by the Packet Line and the corporation known as the Coney Island Company; that extensive repairs were made on the wharfboat, part being paid in cash and the balance in note of the Packet Line and the Coney Island Company; that afterwards the Coney Island Wharfboat Company was formed, with a capital of $10,000, of which stock the Packet Line acquired 50 shares and the Coney Island Company 50 shares, this stock being paid for by a transfer of the wharfboat to the Coney Island Wharfboat Company. There was a failure to show that the indebtedness of the Wharfboat Company was really a debt of the Packet Line and the Coney Island Company. These companies had transferred all the assets to the Coney Island Wharfboat Company, and thereupon all subsequent indebtedness was assumed by the Wharfboat Company, as appears from the fact that thereafter the notes were given from time to time by that company. The 3,000-dollar note was not a lien upon the wharfboat, but was a debt apparently of the Wharfboat Company. The order of court was that the property be sold free from all liens and incumbrances, and provided for the sale of the one-half of the capital stock of the Coney Island Wharfboat Company. The order of court confirming the sale directed that possession "of said property be delivered to the purchaser free and discharged of all liens and incumbrances of whatsoever nature and kind." The purchaser paid his bid and received the property. Mr. Johnson's claim is almost solely based upon a remark made by one of the bidders, Mr. Brooks, at the second sale, to the effect, as he alleges, that the wharfboat would be sold free from liens, and that thereupon claimant and Mr. Brooks concluded that the note held by the bank would be paid out of the proceeds of sale. Mr. Johnson was secretary of the Pittsburgh & Cincinnati Packet Line, and

naturally had knowledge of the various notes given by the Wharfboat Company, and knew that they were not a lien upon the wharfboat, and were not a lien or incumbrance upon the shares of the capital stock of the Wharfboat Company. If he misunderstood the bid, immediately on discovering the facts he should have made proper application to the court for rescission of the sale and return of his money. The testimony of Mr. Johnson was contradicted by other witnesses, and on the whole I am satisfied that the auditor's conclusion with reference to this claim was correct. This exception is therefore overruled.

Second. Exceptions filed by the commonwealth of Pennsylvania: The claim of the commonwealth is for a tax of five mills upon $10,000 worth of the $100,000 capital stock of the Packet Line, for about 11 years. The defendant was a common carrier in interstate commerce between Pittsburgh, Pa., and Cincinnati, Ohio. The evidence shows very little business done by the company in the state of Pennsylvania, the operating expenses being largely in excess of the revenue. Prior to the hearing before the first auditor, the auditor general of the state was notified by letter dated December 28, 1909 (Exhibit No. 11), of the hearing, and requesting him to have a representative present to fix and determine the amount of the tax. There was no reply, no representative was present, nor any proof made before the auditor at any hearing before him, the hearings having closed on February 3, 1910. On February 14, 1910, the commonwealth presented to Mr. Kerr a tax settlement in the sum of $562.50. This settlement was made December 30, 1909, two days after the date of the letter Exhibit No. 11. This tax settlement was presented by Mr. Wasson, attorney for the state, before Mr. Smith, auditor. Passing by the question as to whether the tax should be upon a certain proportion of the capital stock of the Packet Line, or should be based upon the earnings of the company within the state of Pennsylvania, under the twenty-third section of Act June 1, 1889 (P. L. 420), in either event, the lien of the commonwealth for taxes is statutory, and the provisions of the statute must be followed, if the lien is to prevail. As appears from the case of Hays v. Commonwealth, 27 Pa. 272, the auditor general, under Act March 30, 1811 (5 Smith's Laws, p. 228), has jurisdiction to examine and adjust accounts between the commonwealth and any person or body politic or corporate, without notice. When such settlement is made, notice of the same must be given within 30 days afterwards, allowing 60 days after notice to file an appeal. If it should be held that the filing of the claim before the auditor operated as such notice, it still became the duty of the state under Act April 16, 1827 (P. L. 472), to file a certified copy of its lien in the prothonotary's office of the county where the debtor resides. In the case of William Wilson Company's Estate, 150 Pa. 285, 24 Atl. 636, it was held that the repealing clause of the Act of 1879 (P. L. 121, § 18) did not affect the acts of 1811 and 1827 in reference to the collections of moneys due the commonwealth. Speaking of these acts the court said: "Being still in force, therefore, we are obliged to hold that their provisions must be complied with in order to enforce the collection of the claims of the commonwealth, when they are in hostility to the claims of lien creditors in the county where the delinquent debtor resides. As that was not done in this case, the lien falls for the same reason expressed in the cases above cited. We do not see how we could hold otherwise, unless we are prepared to hold that the lien given to the commonwealth is a specific lien upon each item of personal property in question, so as to follow it in whatever hands it may be found. We could not possibly hold such a doctrine, as it would affect all the business carried on by corporations and limited partnerships with such an extremely oppressive and onerous liability as to destroy it altogether. We have never held such a liability by way of lien as this, and it would be entirely hostile to the spirit of our laws and the free interchange of commodities among our citizens." Under this case and the decisions therein referred to, I think the lien of the commonwealth must fall.

Third. Exception of James Rees & Sons Company: This exceptant complains that the auditor erred in intermingling the various accounts and distributing the various funds as one account without considering the rights of various creditors in particular funds. The auditor found that there were no funds derived from the operation and sale of the Queen City, but distributes

to the claimant 1 per cent. out of a general fund, which was derived from the operation and sale of the other boats, over and above the amount of lien claims against such other boats. Exceptant claims that the auditor should have incorporated the net earnings of the boat, as shown by the first account, in his statement of the balance remaining in the hands of the receiver for distribution. In other words, that the account of each vessel was a separate estate, and should have been distributed independently to the lien creditors, with balance to the general fund for general creditors. An exceptant claims that, with the first account incorporated in the final account, there would be a balance of $5,200 to the credit of the Queen City. Exceptant claims all of this balance, to the exclusion of the lien claimants who did not file libels or intervene, and exclusive, also, of all claims of operating expenses and expenses of administration. Exceptant proved three caims: One against the Queen City for $5,753.42, one for $8 against the Virginia, and one for $25 against the Keystone State, all being for material and work and labor done on said vessels at the port of Pittsburgh. As to the claim against the Queen City, the materials were furnished and work done before the filing of the bill and the appointment of the receiver in this case. Afterwards, on May 9, 1909, claimant presented its petition to court for leave to file its libel in the District Court against said vessel, for the purpose of. maintaining its lien or preferred claim, and under permission of court the libel was so filed. It appears, also, that under like circumstances a libel was filed on behalf of a number of creditors against the Queen City in the District Court of Cincinnati. Exceptant claims that all creditors having a statutory or maritime lien, who did not intervene or file their libels, have lost their lien by reason of laches, and can only come in on the fund as general creditors, and that the claims of exceptant and those of the creditors in Cincinnati who filed a libel are entitled to be first paid in full, without deduction for expenses, commissions, or attorneys' fees. Counsel cite in this connection, the case of Moore v. Lincoln Park Company, 196 Pa. 519, 46 Atl. 857, where it was held that: "Where receivers of a steamship company sell vessels of the company upon which maritime liens have been fixed prior to the receivership, they cannot diminish the fund due to the owners of such liens by retaining an allowance for receivers' commissions and counsel fees. For such allowances they must look to the other property of the company."

While the general proposition contended for by exceptant's counsel is true, as shown by the cases cited, I am of opinion that the principle does not apply to the facts of this case. The admiralty rules and authorities cited apply to cases where a libel in admiralty has been regularly filed and seizure of the res has been made, and others having maritime caims have the right to intervene, in which case limitation, laches, or staleness of the claim may be successfully asserted; but in this case James Rees & Sons Company were the plaintiffs in the bill under which the receiver in this case was appointed and possession of the defendant's property taken. Plaintiff thus consented that the receiver should take possession of the boats and property. They were sold by the receiver under this proceeding. The entry ordering the same provided that the boat should be sold free from all liens and incumbrances, and that such sale should be made subject to the approval of the United States District Court. Afterwards the court confirmed the sale, and ordered the receiver to deliver to the purchaser possession of the boats free and discharged of all liens and incumbrances. All this was done in the proceeding instituted by James Rees & Sons Company, and it therefore necessarily follows that they voluntarily submitted themselves to the jurisdiction of this court. Having done so, I think he cannot, by filing a libel in admiralty, ignore such proceeding and obtain superiority in distribution to claims of others of a like character. I think the lien which the various parties had attaches to the fund, and must be paid in the same way as they would have been if the sale had been made by the marshal and the distribution made in a court of admiralty. Certainly the parties had a right voluntarily to submit to the method of sale and distribution which took place here, and so far as the exceptant is concerned this he has done. In the case of Moran v. Sturges, 154 U. S. 256, at page 277, 14 Sup. Ct. 1019, 1025 (38 L. Ed. 981), the court, after stating that a statutory proceeding to wind up a corporation is not a

common-law remedy, and that a maritime lien cannot be enforced in such proceeding, and further that the parties were entitled to have their claims submitted to a court of admiralty according to the rules and practice of admiralty, says: "If the receiver had first taken actual possession of these vessels and sold them, such sale would not have cut off maritime liens and the right to have them enforced, and while it may be true that the state courts, exercising equitable jurisdiction, might undertake, in the distribution of property, to save the rights of holders of maritime liens, yet it is certain that those courts would have no power by a sale under statute to destroy their liens unless they had voluntarily submitted themselves to that jurisdiction." The same general doctrine is announced in Cronenwett v. Baston & A. Transportation Co. (C. C.) 95 Fed. 52; Hudson v. New York & Albany Transportation Co., 180 Fed. 973, 104 C. C. A. 129. In the latter case, the Circuit Court of Appeals announces and applies this rule. In the syllabus it is stated: "While proceedings against vessels in rem to enforce maritime liens are vested exclusively in the District Courts, a Circuit Court could sell vessels free from such liens, if the lienors voluntarily submitted themselves to the Circuit Court's jurisdiction. If holders of maritime liens against vessels came into the Circuit Court having possession of the res, and ask for adjudication upon their liens, they should be held to have assented to the jurisdiction of the Circuit Court for all purposes, including a substitution of the proceeds of sale for the res whenever in the sound discretion of the court, such substitution is necessary to preserve the property from deterioration or secure a better price."

I think this is a proper case for the application of the rule. The one contended for by exceptant would permit a creditor to have a receiver appointed, bring the property to sale, have the same confirmed, and by filing a libel in admiralty assert that all other creditors had lost their lien, and that he had priority, because he had quietly filed a libel in admiralty upon his claim. The application of such a rule would be unjust, and would operate as a trap to other creditors, who were acquiescing in good faith in the receivership, supposing that their liens would be protected when the property was sold and the proceeds distributed. No lien could be asserted—that is, no process could be issued, and the property seized and sold—so long as the receivership was pending, and in this case the receivership has been carried to a finality.

I am also of opinion that the operating expenses and costs of administration must be first paid. The defendant company is a common carrier, a quasi corporation. The cases cited by exceptant's counsel relating to priority of exceptant's claim, while applicable to ordinary receiverships, I think do not apply here, which is a case analogous in principle to the receivership of a railroad company. The distinction is pointed out in Carlenwright L. & B. Co.'s Insolvent Estate, 44 Pa. Super. Ct. 644: "Rutherford v. Pennsylvania & Midland R. R. Co., 178 Pa. 38 [35 Atl. 926], Wallace v. Loomis et al., 97 U. S. 146 [24 L. Ed. 895], and other cases cited, are cases relating to receiverships of railroad companies which are public corporations, the continued operation of which, generally speaking, is important, not only to the creditors, but to the public, and the doctrine applicable to the maintenance of the physical property of such companies under receiverships rests on a different footing from that affecting private manufacturing companies."

The rule relating to priorities in railroad receiverships is stated in American & English Enc. of Law, vol. 24, p. 30: "The costs and expenses of the receivership are chargeable as a lien upon the receivership property, superior to all other liens. The expenses of the receivership are necessarily burdens on the property taken possession of, and this, irrespective of who may be the ultimate owner, or who may have the priority of lien, or who may have invoked the receivership." To the same effect is New York Security & Trust Co. v. Louisville R. R. Co. (C. C.) 102 Fed. 390. It is said in American & English Enc. of Law, vol. 23, p. 1119: "Where the receivership is at the instance of or for the benefit of lien holders, all the property charges, expenses, and disbursements incident to the receivership are a first charge on the funds coming into the hands of the receiver prior to the existing liens upon the property."

I think the exceptant is right in his position that the account of each vessel should stand as a separate fund, to be distributed to the creditors who have

liens on that particular fund; the balance, if any, to pass into the fund for distribution to general creditors. This is effected as follows: On the debit side of the account of each steamer are moneys received from the operations of the boat and the proceeds derived from its sale; on the credit side the disbursements for operating expenses, as shown by the accounts. In the case of the Keystone State there were no operating expenses. The aggregate amount of these balances is a sum greater than the balance shown for distribution. This difference represents what may be called the entire expense of administration. It would seem equitable that each fund should bear its proportion of the cost of administration. This has been worked out in the schedule of distribution. As shown by the auditor's report, it is conceded the schedules B, C, and D thereto attached correctly represent the creditors whose claims have been approved and who have liens on the respective funds.

Lowrie C. Barton, of Pittsburgh, Pa., for appellant.

Charles G. McIlvain, W. R. Murphy, and McIlvain & Murphy, all of Pittsburgh, Pa., for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

McPHERSON, Circuit Judge. This appeal is from a decree of the District Court distributing a fund in the hands of a receiver. The facts appear in the opinion of Judge Thomson, and we shall only repeat a few of them in order to explain the questions that are now decided.

[1] We note first that the fund distributed is a balance arising from two accounts, and that both accounts were confirmed absolutely. The first showed a balance in hand of $2,980.97, and to this no exceptions were filed. It was confirmed absolutely on December 4, 1909, and on December 11 Alfred Kerr was appointed auditor to make distribution. Numerous claims were presented and proved, and he prepared a preliminary report—which he did not live to finish—containing a schedule of distribution in which he preferred eleven of these claims and awarded the whole balance to them. To this schedule exceptions were filed before him by the receiver "and such creditors as may join herein," and these exceptions were accompanied by lists of claims, "presented and duly proven or admitted to be due by the receiver at the time of taking testimony and receiving claims." For a reason to be presently stated, these lists are important.

Nothing further was done upon this incomplete report, and, when the receiver filed his second and final account several years afterward, he properly carried into that account the balance of $2,980.97. Including this sum, the second account showed a balance of $8,713.71. Exceptions were filed, but these were afterward withdrawn, and the account was confirmed absolutely. A second auditor was appointed to make distribution, and all parties concerned (including the present appellant) admitted before him:

"That the creditors set forth in exceptions filed to the report of Alfred Kerr, the former auditor, be agreed upon as the proper creditors, and the distribution therein claimed as a proper distribution of the funds in the hands of the receiver."

Whereupon "the record of approved claims heretofore presented to Alfred Kerr, auditor, and particularly set forth in exceptions filed

237 F.—36

to his report," were offered and received in evidence before the second auditor.

The record thus makes clear (1) that decrees confirming the receiver's two accounts were and are in full force, and therefore that the correctness and the proper application of the debit and credit items in these accounts were not subject to attack either at the audit or in the district court. The duty of the auditor was to distribute the balance of $8,713.71 to the proper claimants, and (as long as the decrees of confirmation remained undisturbed) he had no power to decide that certain items therein had been improperly credited. So far, therefore, as the present appeal seeks to disturb any of these items, we decline to consider it.

It is also clear (2) that by agreement of all parties concerned in the audit a specified list of persons was accepted as "the proper creditors" —the persons entitled to share in the fund. On this appeal, we have chiefly to do with the lien creditors of the steamer Queen City, and when we turn to the list in question to find such creditors we discover the names of numerous persons, with the amounts of their respective claims. This part of the list is expressly described as composed of "claims which are liens upon funds derived from steamer Queen City"; and in it we find, not only the claim of James Rees & Sons Company, but many other claims, the total being nearly $15,000, all of them set out on the same footing, and with no reference to either actual or asserted priority on the part of any. This is the list Judge Thomson accepted and used in the distribution now complained of, and we think the agreement before the auditor justified him in so doing. He has given other reasons for refusing priority to the claim of the Rees Company, and we must not be understood as intimating a disagreement with what he has said on this subject; we think it enough to say that the agreement before the second auditor—which clearly designates the lien creditors of the Queen City, and accepts the list that set them out as equal in rank at the audit of the first account—is not now to be disregarded.

[2] The principal ground on which the Rees Company asserts precedence for its own claim, and for a few others, is the fact that after the receiver was appointed libels were filed upon these claims, although the steamer was not seized and although nothing further was done. This, it is argued, was the exercise of diligence, and as no such action was taken by any of the other lien claimants the latter have lost their lien by laches in analogy to the statute of limitations. If the appellant can avail itself of this position, we think the argument overlooks the further fact that the other creditors have been just as diligent as those who filed the libels referred to; the presentation and proof of their claims before the first auditor was the full equivalent of filing a libel without seizure of the vessel. The statute of limitations ceases to run when the creditor sues, and a creditor sues—i. e., he pursues his legal right before a judicial tribunal—when he asserts his claim to share in the distribution of a fund. It is clear to us that there was no laches, and that all the liens contained in the list stand on the same footing.

Therefore, as the questions raised by this appeal attempt to disturb a situation that we regard as definitely settled either by (1) or by (2), we need not take time to discuss them further.

The decree is affirmed.

(At the argument of this appeal, the receiver presented a petition asking us to make a further allowance for counsel fees and expenses, and to this the appellant. filed an answer. We have examined these papers, and, finding them to contain averments with which the District Court is better fitted to deal, we dismiss the petition, but without prejudice to the right of the receiver to make a similar application to the District Court, if he shall be so advised.

(And, in the event of such application, we empower the District Court to modify the decree of distribution that has just been affirmed, if modification thereof shall seem to be justified.)